# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| THOMAS R. HODGE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:09-cv-519-TWP-DML |
| | ) | |
| GEORGE SHERIDAN, in his official | ) | |
| Capacity as Sheriff of Delaware County, | ) | |
| | ) | |
| Defendant. | ) | |

## ENTRY GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is before the court on the Defendant's Motion for Summary Judgment (Dkt. 42). Plaintiff Thomas R. Hodge's ("Hodge"), complaint consists solely of a failure to train allegation against the Defendant, Sheriff George Sheridan ("Sheriff Sheridan"), in his official capacity. For the reasons set forth below, the Defendant's Motion for Summary Judgment is **GRANTED**.

### I. Summary Judgment Standard

Summary judgment must be granted *"if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law."* Fed.R.Civ.P. 56(c). The Motion should be granted as long as no rational fact-finder could return a verdict in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, a court's ruling on a motion for summary judgment is akin to that of a directed verdict, as the question essentially for the court in both is *"whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."* *Id*. at 251-52.

When ruling on the motion, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences therefrom in that party's favor. *Id*. at 255. If the nonmoving party bears the burden of proof on an issue at trial, that party *"must set forth specific facts showing that there is a genuine issue for trial."* Fed.R.Civ.P. 56(e); *see also Silk v. City of Chicago*, 194 F.3d 788, 798 (7th Cir.1999). The moving party need not positively disprove the nonmovant's case; rather, it may prevail by establishing the lack of evidentiary support for that case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## II. <u>Factual Background</u>[1]

In the year 2000, a warrant was issued for Hodge for failure to appear at court in Muncie, Indiana. In 2003, at age thirty-three, Hodge was found to be incapable of caring for himself and his parents were appointed as his co-guardians by the Jay County, Indiana Circuit Court. Hodge is mentally handicapped and functions at a *"sub-average intellectual capacity."* On April 3, 2007, in Muncie, Indiana, Hodge's brother's girlfriend called the police claiming that Hodge kicked her and refused to leave her apartment. As a matter of routine procedure while responding to the call, the police learned of the outstanding warrant and promptly arrested Hodge.

Hodge was handcuffed and brought to the Delaware County Jail by the arresting officer, Ronald Miller ("Officer Miller"), of the Muncie Police Department. Officer Miller stayed with Plaintiff in the jail's intake waiting area, until a jail officer was available to initiate the booking process. Hodge yelled at the arresting officer while in the waiting area, demanding that the

---

[1] The factual background is set forth in a light most favorable to the non-moving party with all reasonable inferences afforded that party.

officer take the handcuffs off of him and eventually shouting loud enough to prompt more immediate attention from the jail officers.

Two jail officers, Gerald Shaner ("Shaner") and Randy Parker ("Parker"), escorted Hodge from the waiting area to the pat down area and Hodge continued to scream, curse and pull his arms away from the officers, as they walked him down a corridor. When directed to calm down, Hodge would occasionally comply for a moment before launching into another loud rampage, most often complaining that he wanted the handcuffs taken off. It is undisputed that while he was uncooperative and resistant, Hodge did not try to strike or otherwise assault the officers at any time.

Shaner testified at his deposition that it would be typical to remove the handcuffs from a cooperative detainee once they arrived at the pat down area, but Hodge continued to be resistant and uncooperative so he remained in handcuffs as Shaner attempted to pat him down. While attempting to obtain Hodge's cooperation, Shaner and Parker each administered blows with their knees to the area above Hodge's knees and below his thighs. Such blows are designed to collapse the legs of an individual and, according to Shaner, were administered in a mostly unsuccessful attempt to gain Hodge's compliance with a pat down. Shaner testified that there were a total of three of these blows administered, two by him and one by Parker, before Shaner was able to situate Hodge over a table where he could put pressure on his back with one arm to keep him leaning over the table while the pat down was completed. According to Shaner, at this point he observed nothing that would have led him to believe that Hodge was mentally handicapped.

Hodge was next escorted to a segregation cell, which is where a detainee is taken to "cool down" if they are creating a disturbance and refuse to participate calmly in the intake interview. According to Shaner, on the way to the segregation cell, Hodge *"went dead weight"* on the officers, but they were eventually able to persuade him to continue walking. Shaner states that even after arriving at the segregation cell, Hodge screamed, cursed and acted uncooperative as they attempted to remove his outerwear garments, which they eventually accomplished. Hodge was asked if he wanted to see a doctor, but he declined the offer. Shortly thereafter, Hodge began crying and asking for his "mommy" in a childlike manner. Shaner testified this was the first indication that Hodge was mentally challenged.

According to Shaner, up to that point in the booking process Hodge appeared to understand the officers' directions and orders, but was not necessarily willing to comply with them. When asked what procedures are used by the jail officers to determine if a detainee had special needs, Shaner explained that it was the policy for jail officers to ask certain questions of inmates during the intake interview to determine if the person had any special needs, such as prescription medicines, a mental handicap or other health issues. However, that interview cannot be conducted until the inmate begins to cooperate.

Shaner completed a form questionnaire used by the jail for each inmate which is titled "Examiner Observations" and which requires a yes or no response to 26 questions. Pertinent to this dispute, yes responses were provided to the following inquiries regarding Hodge: Understands Questions; Angry/Hostile Behavior; Loud Obnoxious Behavior; Bizarre Behavior; and, Unpleasant. Shaner answered no to the question that asked if Hodge was assaultive or violent and to an inquiry regarding any self inflicted injuries or scars.

4

After reviewing records from Hodge's previous bookings and learning Hodge was in the segregation cell calling for his mother in a child like manner, Shaner noted on the "Inmate Information Summary" a warning that Hodge was to be placed on suicide watch and noted that he had *"obvious mental issues."* Shaner testified that he was not concerned that suicide was imminent, but he thought that the jail psychologist should see Hodge the following morning and he stated that many inmates were placed on various levels of suicide watch for safety purposes, including some who were to be observed as often as every five minutes.

Shaner also completed a "Non-Lethal Force Report Form," indicating that the officers had used several degrees of force while dealing with Hodge, including: knee strikes, a figure four leg lock, a wrist lock, the escort position and application of pressure to the right mandibular angle, a pressure point behind the ear lobe. According to the check-off boxes which were completed on the report, the officers used the force because: (1) it was necessary for self-defense; (2) to prevent violent/forcible felony; (3) to restrain the subject for his own safety; and, (4) it was necessary in defense of others. According to the report, Hodge was not injured as a result of the force used.

At his deposition, Hodge described the booking circumstances differently. Both parties submitted portions of his deposition testimony, which in many respects is difficult to follow. However, Hodge clearly testified that when he was at the pat down area, one of his hands was released from the handcuffs and when that occurred he was told to put his hands on the table and spread his legs. He claims to have tried to comply, but was kicked by the officers and told to spread his legs further apart. He states he tried to retrieve his wallet from his back pocket with one had, at which time the jail officers took him to the floor and began kicking him. Hodge has

submitted a photograph of himself, taken by his mother shortly after his release from jail, which was made an exhibit at his deposition. The photograph shows what appears to be significant bruising of his right leg, both below and above the knee, with the most severe bruising being below the knee. There also appears to be bruising to Hodge's right arm and wrist. There is no way for the court to determine from the photograph when the bruising was incurred.

In his official capacity as the Sheriff of Delaware County, Sheriff Sheridan is responsible for the Delaware County Jail. The jail has an inmate classification policy, No. 4.2.4, covering the subject of "Special Needs Inmates." It states: *"It is the policy of the Delaware County Sheriff to identify at the time of intake, or as soon thereafter as possible, all inmates requiring special management and to provide special programs and services to those inmates."* The purpose of the policy is: *"To describe the procedure that will be used in the Jail to identify and manage special needs inmates."* Under the procedural guidelines for the policy it states that, among others, inmates who are emotionally disturbed, mentally ill or mentally handicapped are considered to have special needs. It goes on to specifically state that: *"Mentally handicapped individuals are those who function at a sub-average general intellectual level and who may be deficient in adaptive behavior or the degree to which they meet the standards of personal independence and social responsibility expected of an individual in their age and cultural group."*

Hodge originally filed this lawsuit in state court, naming as defendants, Officer Miller, the Muncie Police Department, the County of Delaware and Sheriff Sheridan. He initially asserted only state law claims. The parties stipulated to the dismissal of Officer Miller and the Muncie Police Department and an Amended Complaint was filed against only Delaware County

6

and Sheriff Sheridan, which complaint for the first time asserted Hodge's constitutional rights had been violated. The lawsuit was removed to this court, where a Second Amended Complaint was filed, naming only Sheriff Sheridan in his official capacity as the Defendant, and asserting what is commonly referred to as a *Monell* claim under 42 U.S.C. § 1983. *See Monell v. Dept. of Social Services of the City of New York*, 436 U.S. 658 (1978). In this case it is alleged that the sheriff failed to train the members of the jail staff to identify the mentally handicapped and failed to train the officers to follow the applicable policies for use of force.[2]

Sheriff Sheridan has moved for summary judgment in his favor, contending that there was no violation of Hodge's constitutional rights and that Hodge is unable to provide admissible evidence to support all the necessary elements to prove a *Monell* claim premised on a failure to train. Hodge claims that he was subjected to excessive force in violation of his constitutional rights and that material questions of fact preclude a determination that this was not the result of the Sheriff's failure to adequately train the jail's staff.

### III. Discussion

In *Monell*, the Supreme Court ruled that a municipality may be held liable under 42 U.S.C. § 1983 if the allegedly unconstitutional action implements or executes a policy or custom that has been adopted or promulgated by that municipal body. *Id*. at 993-94. A policy or custom exists where the policymakers have made a deliberate choice from among various alternatives to follow a particular course of action. *Pembaur v. Cincinnati,* 475 U.S. 469, 483-84 (1986). There

---

[2]While the Second Amended Complaint alleges a separate count with respect to the failure to train officers with regard to the use of force, the focus of Hodge's argument has been on the use of force when dealing with someone who is mentally deficient. Indeed, the record shows that all of the officers involved here and, indeed, all of the officers at the jail, receive significant use of force training both at the time they start as officers and on an ongoing basis throughout their careers. In short, there is simply no evidentiary basis to support a claim for lack of training on the use of force *per se.*

must be a causal nexus between the injury and the policy or custom, otherwise liability would be *de facto respondent superior*, which *Monell* prohibits. *Cornfield By Lewis v. Consolidated High School Dist. No 230,* 991 F.2d 1316, 1327 (7th Cir. 1993).

The inadequacy of officer training may serve as a basis for Section 1983 liability in only limited circumstances where:

> In light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policy makers of the [governmental agency] can reasonably be said to have been deliberately indifferent to the need.

*City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989). In other words, the policymakers must have had *"actual or constructive notice that a particular omission is likely to result in constitutional violations." Cornfield by Lewis*, 991 F.2d at 1327.

Typically, when a Section 1983 *Monell* claim is brought against a city or local government agency as a result of an alleged use of excessive force, there is also a Section 1983 claim brought against the individual actor as well. However, in this case there is no claim being made against any of the officers involved in Hodge's arrest or incarceration. Accordingly, the Supreme Court has told us that *"the focus must be on the adequacy of the training provided in relation to the tasks the particular officers are charged with performing." Id*. It is not enough that a particular officer may not have been trained well or that an injury could have been avoided if an officer had received more or better training. *Id*. at 390-91. The key question is: *"Would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?" Id*. at 391.

Hodge argues that while the policy of the jail is to identify those inmates who may have special needs as promptly as possible, the jail officers are provided no training which would

8

allow them to identify someone who may be lacking intellectual abilities to the point of being deficient in adaptive behavior. According to Hodge, if appropriate training had been provided, the officers would have been able to employ "de-escalation techniques," use empathy or otherwise communicate in a manner which could have defused his anger and confusion and gained his compliance. The officers receive training in all of these techniques for dealing with inmates who may have mental competence issues; however, according to Hodge, such techniques are worthless if not employed because the officers are unable to identify the inmates who have competence issues. Notably, Hodge has offered no evidence or expert testimony regarding any standards followed for identification of mental incompetence or the type of training which would be required to give the jail staff the expertise to make such determinations. Nor has he offered any case law to support his assertion that the need for such "identification training" is obvious. Furthermore, the record is devoid of any evidence of the jail staff's failure to identify any other mentally incompetent inmates.

Sheriff Sheridan, on the other hand, has pointed out that deliberative indifference is a stringent standard, citing numerous cases where courts have found that the alleged need for similar types of specific officer training is either not obvious or otherwise insufficient to support a *Monell* claim. *Palmquist v. Selvik*, 111 F.3d 1332, 1345 (7th Cir. 1997) (court stated it could not accept the equation - no special training = deficient training); *Febus-Rodriguez v. Betancourt-Lebron*, 14 F.3d 87, 93 n. 6 (1st Cir. 1994) (*"We do not find that the need to extensively train officers about how to identify and deal with mentally handicapped persons is so obvious, that failure to give this training supports a finding of reckless or callous indifference to constitutional rights."*); *Buchanan ex rel. Estate of Buchanan v. Maine*, 417 F.Supp.2d 45, 71

9

(D.Me. 2006) (without evidence that there had been any previous failures to identify a mentally ill individual court could not conclude that a "grave risk" was ignored by not training officers to make such identifications); *Franklin v. Manek*, 2004 WL 1629544, *10 (S.D.Ind. 2004) (alleged failure to properly train officers on how to deal with noncompliant highly intoxicated individuals located within their homes could not support a *Monell* claim).

The record shows that the Delaware County Sheriff's Department has been a satellite location for training of jail officers through the Indiana Law Enforcement Academy. Other counties send their officers to the training conducted by the Sheriff's Department. There is a 40 hour course for new jail officers, followed by a second 40 hour course shortly thereafter. In addition, in-house training of 40 hours or more per year is provided to officers. The jail's psychologist provides training on the management of inmates with mental illnesses as a part of these various training sessions, which includes recognition of expected behaviors.

In the instant case, there is no evidence that would link a lack of training to the injuries suffered by Hodge. Even if Shaner or another officer had identified him as mentally deficient, it cannot be said with any degree of certainty that the use of force would not still have been necessary to gain Hodge's compliance. Without any evidence of other comparable circumstances that might have alerted Sheriff Sheridan to a need for more or different training, Hodge simply cannot show a deliberate indifference on his or other policymakers' part. Accordingly, Defendant's Motion For Summary Judgment must be granted.

## IV. Conclusion

For the reasons explicated in this Entry, Defendant's Motion For Summary Judgment (Dkt. 42) is **GRANTED**. A separate judgment shall enter in favor of Defendant, George Sheridan, in his official capacity as Sheriff of Delaware County, and against Plaintiff, Thomas Hodge.

SO ORDERED. 03/17/2011

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Copies to:

Rochelle Elaine Borinstein
Attorney at Law
rborinstein@stanleykahn.com

James S. Stephenson
STEPHENSON MOROW & SEMLER
jstephenson@stephlaw.com

Ian L. Stewart
STEPHENSON MOROW & SEMLER
istewart@stephlaw.com